Ruby H. SIEGEL, Respondent,

v.

Bessie ELLIS, Executrix of the Estate of
Mike Siegel, Deceased, Appellant.

No. 44527.

Supreme Court of Missouri.
Division No. 1.

March 12, 1956.

Motion for Rehearing or to Transfer to
Court en Banc Denied April 9, 1956.

Max Sigoloff, St. Louis, for appellant.

Howard Elliott, Fred Armstrong, Edward D. Weakley, St. Louis, for respondent.

HOLLINGSWORTH, Judge.

This action was instituted in the Probate Court of St. Louis County, where respondent-plaintiff's demand, based upon an account stated, was allowed against the estate of Mike Siegel, deceased, in the sum of $9,876, from which the executrix of Mike Siegel's estate appealed to the Circuit Court. Upon trial to a jury in that court, plaintiff had a verdict for the aforesaid

934

principal sum of $9,876, together with interest thereon at six per cent per annum from June 21, 1951, in the sum of $1,637.77. Following an unsuccessful motion for new trial, the executrix has appealed from the judgment rendered in accordance with the verdict of the jury. She here contends: (1) that the demand filed in the probate court is insufficient in law to support a valid judgment; (2) that respondent's evidence does not support the demand upon which he recovered; (3) that respondent's submission instruction was prejudicially erroneous; and (4) that the court erred in the admission and refusal of certain testimony.

██ The record consists of more than 500 typewritten legal size pages. A painstaking reading of it shows it to be replete with testimony relating to collateral matters introduced for the purpose of discrediting the witnesses of the respective parties, and appellant has here, in a voluminous brief, again presented and argued some of those matters, apparently on the theory that we should weigh the evidence and determine the facts as though we were considering an equity or a jury-waived law case. But we do not weigh the evidence in jury-tried cases. It is only when there is a complete absence of probative facts in such cases to support the verdict that appellate courts are authorized to interfere. 3 Mo.Dig.Pt. 2, Appeal and Error, ██ and 1001(1). Consequently, we must state and review the evidence from the viewpoint most favorable to respondent, Machens v. Machens, Mo., 263 S.W.2d 724, 734[16], and disregard defendant's evidence except to the extent it aids plaintiff's case, 3 Mo.Dig.Pt. 1, Appeal and Error ██

After spending some ten weeks in other hospitals, Mike Siegel entered the Jewish Hospital in the City of St. Louis on February 10, 1950, where, on the 7th day of June, 1950, he died at the age of 76 years, survived by three sons, respondent Ruby, Sol and Louis, and a daughter, Bessie Ellis, all of whom were adults, Ruby being past fifty, Sol next in age, followed in order by Bessie and Louis, the latter being then in

his "forties". Mike Siegel's wife had predeceased him in February, 1950. His will, dated March 28, 1946, and naming Bessie Ellis as executrix, was probated on June 29, 1950. Its provisions shed no light upon the questions here presented for review.

It is admitted that although Mike Siegel was physically weak and infirm during his stay in the Jewish Hospital, yet he was at all times until his death possessed of full mental vigor. He was an illiterate man, limited to the ability to inscribe his signature and to record and compute simple numerals. But, for twenty-five years prior to his death, he had successfully operated an unincorporated auto supply store at 4844 Easton Avenue in the City of St. Louis under the name of U. S. Auto Supply Company.

At trial time, respondent was and had been for forty-one years an employee of Missouri Pacific Railroad Company. For the past thirty-eight years he had been "chief statistician", which, as we understand, constituted him the supervising timekeeper of some 1,250 employees. He was a trusted employee and as such was permitted to go to and leave his place of employment as he desired, subject only to the requirement that he discharge the duties of his employment. Sol had operated an automobile battery business in the basement of the U. S. Auto Supply Company for many years. Bessie does not appear to have been connected with the business in any manner and did not testify. Louis was associated with his father in the conduct of the Auto Supply Store. A dispute exists as to his interest in that business; Louis contending that he had been a partner with his father in that business since 1940. Respondent and Sol, however, say he was a partner "for income tax purposes only". Admittedly, he was never permitted to sign checks and there is little, if any, evidence that he regularly shared in any stated or agreed percentage of the profits.

The controversy here presented is principally between respondent on the one side and Louis on the other. Sol's testimony strongly corroborates the testimony of re-

spondent, although it is admitted by all of the parties that respondent and Sol were and had been "bad friends" for twenty-five years. It further appears from the evidence that prior to the filing of the demand involved in this case and prior to any knowledge on the part of Sol, Bessie or Louis that respondent would present such a demand, Bessie, as executrix, had instituted an action for discovery of assets against respondent, Sol and Louis, which had been settled by an agreed distribution of the assets in question. The extended arguments made by counsel to the court concerning the admissibility of all or any part of the facts out of which that incident arose, the rulings of the court upon the admissibility of such facts and certain of the details thereof, and the conflicting testimony to the extent admitted by the court require that we briefly state the incident as shown by the testimony admitted: On March 13, 1950, a check signed by Mike Siegel and drawn on U. S. Auto Supply Company payable to respondent and Louis in the sum of $18,000 was deposited in a bank to the joint credit of respondent and Louis. The version of respondent and Sol as to the issuance and purpose of this check is: that in the presence of his three sons, Mike Siegel suggested that they withdraw all of the funds of the U. S. Auto Supply Company from the bank (there was about $21,000 on deposit at that time) and that the money and all of the assets (consisting of bonds, etc.) in Mike Siegel's safety deposit box be divided equally among the children; that respondent suggested the father leave the money in the bank for the payment of bills that might arise; that the father said he would leave a sufficient amount for that purpose, $3,000, and thereupon signed a check, which had been filled out by Louis, payable to respondent and Louis, in the sum of $18,000, which, with the full consent of all three of the sons, was deposited in the joint names of respondent and Louis; that thereafter the contents of the safety deposit box were withdrawn, but neither the cash nor the contents of the safety deposit box were divided among the children until a citation for concealment of

assets had been filed by the executrix against the three brothers, which case was amicably settled by a division satisfactory to all of the parties. Louis' version was that he (Louis) and respondent surreptitiously obtained a check that had been signed in blank by their father and thereafter, without the knowledge or consent of their father, filled it in payable to themselves in the sum of $18,000, and that the three brothers, for the ostensible purpose of keeping the money to pay such bills as might accrue against their father, thereafter caused said check to be deposited to the credit of respondent and Louis for the benefit of the three brothers.

We now state the testimony adduced in support of the demand involved in this case. In the early part of 1945, due to the exigencies of war, there was an extreme shortage of and demand for household and electrical appliances and Mike Siegel was anxious to get into that business. He, however, had no connection with any of the suppliers and was unable to make any. On the other hand, respondent had gone out of his way to secure and, due to his railroad experience and connections, had been successful in securing railroad transportation facilities (also very difficult of obtainment) for persons in the business of supplying electrical appliances to retailers. At that time the suppliers of electrical appliances had a custom of granting to (or withholding from) established retailers exclusive franchises to sell their products within given areas. Such franchises were also difficult to obtain. Respondent's aforesaid activities had made him many friends among such suppliers and he was confident he could acquire the necessary franchises, and he so advised his father. Respondent said to his father, however, that he did not have adequate funds or credit to handle such matters and that if the father would handle this phase of the business through the U. S. Auto Supply Company and divide the profits on a "fifty-fifty basis", respondent would make money for both of them, to which his father "heartily agreed". At the same time (early part of 1945) respon-

dent's mother was sorely distressed because she and Mike Siegel owned no home and she lived in fear of eviction from rented premises. Respondent proposed to his father that out of profits from the contemplated enterprise they jointly would buy a duplex residence property in which both his parents and respondent and his family could live. Mike Siegel thought the proposal a good idea and agreed to it. They further agreed that the father would keep all of the money in the account of U. S. Auto Supply Company, in the Mercantile-Commerce Trust Company and that the father would also keep the books, which he did in a "little black book", kept under lock and key separate from the automotive supply business.

When the parties had agreed in the manner aforesaid, respondent called upon suppliers for whom he had "gotten favors" and obtained six franchises for the sale of well-known products and also procured "merchandise from a hundred others". Four franchises were introduced in evidence. All were in the name of U. S. Auto Supply Company. Plaintiff also procured and sold from the store at retail in season large quantities of Christmas trees under a "50-50" agreement with his father, the proceeds of which were likewise deposited to the credit of U. S. Auto Supply Company and a record of the sales was kept in the little black book. Typical of the appliances sold were washing machines, radios, sweepers, deep freezes, toasters, electric mixers, irons, and the like. Respondent, with the consent of his employer, worked "night and day" in procuring, selling and delivering the merchandise handled under the agreement with his father. As sales were made and reported to the father, he (the father) would mark down the dates, "2 for the second month and 3, and mark down the months and what day and what profit we made and how much sales we made".

At first, respondent tried to keep some records, but it was "too much" for him and he entrusted all of the records to his father with absolute reliance upon his word. Each Saturday he and his father would discuss

their profits and his father would advise him of the amount. Perhaps twice each year his father would advise him as to the accumulated profits. Invoices for merchandise purchased would be kept in a box by the father until they were looked over and found correct. Many items of merchandise were sold by respondent for cash and respondent occasionally would also pay suppliers in cash. These transactions were reported to the father and recorded in the black book. All other bills were paid by checks of the father drawn on the account of U. S. Auto Supply Company.

At the end of the first year, about $5,000 in profits had accumulated in the account and the father located a desirable residence property. A contract for its purchase was entered into and the father paid down $1,-500 in earnest money, but the seller "backed out", and the transaction failed. Respondent and his father continued their search for a desirable property and the profits from the joint enterprise continued to accumulate in the bank account of U. S. Auto Supply Company until plaintiff became ill from overwork and exhaustion in the latter part of 1949. Shortly thereafter, in the early part of 1950, the father became ill, from which illness he died; and thus the enterprise, for all practical purposes, ended in the latter part of 1949. Sometime in March or April, 1950, the father told respondent to get the black book out of the store. When respondent went to the place in the store where the book was usually kept in a box with a hasp lock thereon, he found the box broken open and the book was gone. This fact was reported to the father.

On May 5, 1950, the father called respondent to his bedside in the Jewish Hospital and said: " * * * I have been doing a lot of thinking the last couple of days, you worked pretty hard for your money and I want to give to you whatever you have coming. I am getting weaker all the time and I don't think I will come out of this hospital alive." Respondent reminded his father that he did not then have enough money in the bank to pay respondent. The

father stated that he wanted respondent to have something in writing to the effect that he owed respondent "this money". Respondent did not know the exact amount then due him but the father said, "We made $19,752.00." Respondent thought it was $200 more than that, but agreed that one-half of that amount, $9,876, was satisfactory to him. The father said, "Take a check and fill it out and bring it back", and he would sign it. Respondent took a blank check from the blank checks kept by his father in a drawer in a chest in the hospital to his railroad office and filled it in with the typewriter, typing on the left end of its face:

"This check for, and in full settlement of profits of household appliances, years 1945 to 1949, inclusive",

and otherwise filling it out in words and figures following:

"U. S. Auto Supply Co.
4844 Easton Ave.

No. 7497

Saint Louis, May 6th 1950 4–26
810

Pay to the
order of _____ Ruby H. Siegel _____ $ 9876.00

Nine Thousand eight hundred seventy six & no/100.............Dollars

To Mercantile-Commerce
Bank and Trust Company
Saint Louis, Mo.

U. S. Auto Supply Co.

_____ "

On the following day, May 6, 1950, at the hospital in the presence of respondent's wife, respondent's son-in-law and Ben Kelner, an old friend of the father, respondent told his father that he had the check, as his father had told him to prepare it, read it in full to him and the father there signed his name, "M. Siegel", as maker thereof and delivered it to respondent. The check is in the record. The signature is unquestioned.

Within one year after grant of letters to Bessie Ellis, to wit: on the 22nd day of May, 1951, respondent exhibited the demand upon which this action is founded by serving upon the executrix notice in writing, advising her that he would present to the probate court a claim for the sum of $9,876.00 "found upon Account stated of which the following is a copy:

"Account stated with decedent representing agreed share of proceeds from sale of household appliances $9,876.00",

followed by his duly subscribed oath that the amount demanded was justly due him. Thereafter, at the expiration of more than one year after the grant of letters, to wit: on January 24, 1952, respondent filed a duly verified amended claim, which, omitting caption, reads as follows:

"Amendment to Claim of Ruby H. Siegel.

"Comes now Ruby H. Siegel, claimant against the estate of Mike Siegel, deceased, in the above entitled proceeding, and amends his claim by inserting after the words:

"'Account stated with decedent representing agreed share of proceeds from sale of household appliances $9,876.' the words:

"'More particularly, the account started in 1945 and terminated in late 1949. It was the account of transactions between deceased and claimant in the conduct of a business in electrical household appliances. In early 1950, the account was verbally stated between them at $19,752.00, of which claimant's share was $9,876.00, to which statement claimant assented at the time. Thereafter, as soon as it could be pre-

pared, under date of June 7, 1950, deceased gave claimant a check in evidence thereof, which check had not been cashed by claimant at the time of decedent's death.' "

Appellant insists respondent is not entitled to recover because "neither the original claim filed in the Probate Court nor the amended claim * * * is in evidence; that neither of said claims complies with Section 464.030 RSMo 1949, V.A. M.S., because of being vague and indefinite and uncertain as to dates or years when the alleged claim arose; the failure of plaintiff to attach thereto a copy of the instrument of writing, namely, the check, he claims to have received from his father, * * *; neither claim states facts sufficient for recovery on an account stated; that the original claim being insufficient the amended claim which clearly shows a departure from the original claim is insufficient."

■■■■ We know of no requirement that the claim be introduced in evidence and appellant has cited us to none. But even if such were the law, the record shows that early in the trial appellant offered both the original and the amended claims and the proofs of exhibition thereof in evidence, and they were thereafter treated by both court and counsel as being in evidence. A demand filed in the probate court is not to be judged by the strict rules of pleading. It is sufficient if it gives reasonable notice to the legal representative of the estate of the nature and extent of the claim and is sufficiently specific that a judgment thereon will be res judicata of the obligation upon which it is based. And it is only when the original claim is wholly insufficient that it may not be amended after the limitation period fixed by statute for the filing of claims. In re Franz' Estate, Mo., 245 S.W. 2d 1, 4–5; 34 C.J.S., Executors and Administrators, § 417(f), p. 199. The original claim unquestionably advised appellant in a general way of the nature and extent of respondent's claim. It alleged, in effect, an agreed indebtedness of the decedent to respondent in a specific sum for respondent's

share of proceeds from the sale of a specified type of merchandise. It was not wholly insufficient. When amended without change as to amount or character, it fully apprised appellant of all of the essentials of an agreed statement of account entered into between respondent and his father. Authorities, supra. It was not necessary that the check held by respondent be attached to or made a part of the demand. An account stated need not be evidenced or proved by a writing. Alexander v. Scott, 150 Mo.App. 213, 222, 129 S.W. 991, 994; Bloss v. Aurora Milling Co., 207 Mo.App. 402, 229 S.W. 833, 835 [3]; 1 Am.Jur., Accounts and Accounting, § 21, p. 276; Gerstner v. Lithocraft Studios, Inc., Mo.App., 258 S.W.2d 250, 253 [1]. The account stated in the demand, and more fully in the amended demand, according to plaintiff's evidence became a binding contract by virtue of an oral agreement. The check, of course, was evidence tending to support the oral agreement, but the contract was enforcible without it.

We hold that the demand upon which the case was tried was sufficient in form and substance to support the judgment rendered.

Respondent's submission instruction is challenged in several respects. It hypothesized a finding that if the jury believed "that during the year 1945 Ruby Siegel entered into an arrangement with his father for the obtaining of franchises in the name of the father's company, the United States Auto Supply Co., and for the purchase of household appliances under those franchises and otherwise, on the credit of his father, Mike Siegel, with the understanding that Ruby Siegel would select, sell and deliver the items or arrange for the sale and delivery of them, the monies from which sales to be deposited in the father's bank account, to be used for the joint purchase of real estate, and if you further find and believe that during the years 1945 through 1949 Ruby Siegel and his father continued this relationship, and that on or about May 5, 1950, Mike and Ruby Siegel compared their accounts and agreed that Mike Siegel's computation was correct and that Mike Siegel was indebted to Ruby

Siegel in the amount of $9,876 being one-half of Ruby's share of the said profits in Mike Siegel's possession, and if Mike Siegel agreed to pay Ruby Siegel the sum of $9,876 in satisfaction of the indebtedness, and Ruby Siegel agreed to accept that sum in satisfaction which sum thereafter remains unpaid, if you so find, then the jury shall find for the plaintiff, Ruby Siegel, against the estate of Mike Siegel in the sum of $9,876 with interest from June 21, 1951."

■ Appellant says the instruction assumed "that * * * Ruby Siegel selected, sold and delivered items or arranged for the sale and delivery of them" and that he was authorized so to do, when there was no evidence that he had such authority. Contrary to appellant's contention that the instruction assumes the facts aforesaid, it expressly requires a *finding* of such facts (and others) as the basis of any verdict it could return in favor of respondent, and the testimony of Ruby H. Siegel warranted the submission of each and every of the facts hypothesized therein.

■ Appellant further says the instruction erroneously "submitted to the jury two causes of action in that, said instruction undertook to split a single cause of action into different causes of action, by submitting to the jury for their consideration an alleged claim based upon a joint ownership of real estate and also a claim based upon a profit sharing transaction between plaintiff and his father." The contention is not sound. True, the evidence shows that the original agreement contemplated that the profits be invested in a home for the joint use of the two families, but it also shows that at the time Mike Siegel suggested a casting up and an agreement as to the amount of profits accruing to respondent, Mike's wife was dead and Mike believed that he would not leave the hospital alive. That portion of the prior understanding as to investment of the profits in a jointly owned home was by Mike himself abandoned, and, according to the evidence, Mike admitted and the parties agreed that as a result of their joint venture Mike owed respondent $9,876.

■ Appellant further says the instruction erroneously told the jury in effect that respondent "earned twice the amount he sued for". This contention is based upon the facts hypothesized in the phrase "that Mike Siegel was indebted to Ruby Siegel in the amount of $9,876.00 *being one-half of Ruby's share of said profits* in Mike Siegel's possession * * *". Obviously, the phrase "being one-half of Ruby's share" is a mere inadvertence. The writer of the phrase meant to say, in effect, that Mike Siegel was indebted to Ruby in the amount of $9,876 [as] being one-half *or* Ruby's share of said profits. The jury could not have been misled by such a recital.

■ Appellant further says the "instruction failed to allege the dates when an agreed share of the profits was arrived at, nor does the instruction properly declare the law on an account stated. The evidence failed to establish an account stated and the instruction failed to properly declare the law on an account stated. It failed to allege that both plaintiff and his father agreed to an amount due plaintiff on account of a transaction between them." The instruction, on its face, definitely reveals that it is not subject to either of the forgoing criticisms.

Appellant contends that respondent is estopped from asserting this claim because he concealed "from his brothers and sister the fact that he was possessed of a check for $9,876.00 * * * until the settlement of the concealment of assets claim * *"; that respondent "not only took advantage of his brothers and sister, but also took advantage of his father in having him sign a check for $9,876.00 when he was at the threshold of death, and after his death plaintiff refused to carry out his father's dying request that the contents of the safe deposit box shall be distributed equally among all his four children"; and that "he (respondent) failed to disclose a material fact known only to him of the existence

of the check. The knowledge of the check which was not within the fair and reasonable reach of his brothers and sister at the time of the settling of their difference on the concealment of assets claim"; and that he was therefore guilty of legal fraud.

■ Suffice to say that the proceeding for discovery of assets and the settlement of that action had no connection whatever with this demand. That respondent did not make known the fact that he had the $9,876 check or that he intended to file the demand here in issue until the parties had settled the action for concealment of assets was fully (and properly) developed before the jury, as bearing upon respondent's credibility. But, as stated, we do not weigh the evidence and appellant's argument has no place here. We must decline to further consider it.

■ Appellant also contends that respondent "is not entitled to recover because he well knew when he accepted the check there were no funds in the bank to pay it". The contention is devoid of merit. The check was given with the understanding that there were insufficient funds in Mike Siegel's account to meet it but that it would constitute evidence of their oral agreement.

■ Appellant further contends there "was a total failure of proof on the part of plaintiff in that plaintiff's amendment to the claim as filed in the Probate Court alleges that the check dated June 7, 1950, for the sum of $9,876.00 was signed by the deceased. Whereas, plaintiff's Exhibit 5 is a check purporting to have been signed by the deceased for $9,876.00 is dated May 6, 1950." The date of June 7, 1950, set forth in the demand as being the date of the check (it was dated May 6, 1950) is patently the result of confusing the date of Mike Siegel's death (June 7, 1950) as the date on which the check was given. No one is shown to have been or even claims to have been misled by the error. Furthermore, the action was not predicated upon the check but upon the oral agreement, which the demand shows to have been made

on some date prior to June 7, 1950. In the absence of any showing of prejudice, the assignment must be overruled. Appellant's assignment of error in the admission of said check into evidence, based upon the same ground, is likewise, and for the same reason, overruled.

■ Appellant urges error in the admission of the "franchises" obtained by respondent in the name of U. S. Auto Supply Company from suppliers of electrical appliances on the ground they were hearsay. Obviously, they were not hearsay. They were the originals and constituted the best evidence of their existence.

■ Appellant complains of the refusal of the trial court to admit into evidence certain of the details concerning the withdrawal of the $18,000 from Mike Siegel's account in March of 1950 and the withdrawal of certain assets from his safety deposit box at about the same time and respondent's refusal to distribute said assets as directed by his father until an action for discovery of such assets had been instituted. It would unduly lengthen this opinion to set forth the specific details to which appellant directs our attention. The entire matter was purely collateral. It had no connection whatever with the demand involved in this suit and was admissible solely because it tended to impeach the testimony of respondent and Sol. The trial court did permit the jury to hear the essentials of the matter as declared by the contending parties but could not permit a trial of those issues because they had been compromised and settled and, more importantly, perhaps, because to have done so would have tended to confuse and distract the jury from a proper determination of the issues in the case on trial. The trial court is properly vested with a broad discretion in determining the extent to which it will permit the cross-examination of a witness as to collateral matters. Smith v. Thompson, 346 Mo. 502, 142 S.W.2d 70, 73; Bush v. Kansas City Pub. Service Co., 350 Mo. 876, 169 S.W.2d 331, 333; Gildehaus v. Jones, 356 Mo. 8, 200 S.W.2d 523, 526; Hilton v. Thompson, 360 Mo. 177, 227 S.W.

2d 675, 681. A reading of the record in this case shows no abuse of that discretion insofar as appellant is concerned.

█ Finally, appellant urges error in the admission of evidence to the effect that respondent "left his office whenever he felt like it, and that he was at liberty to come and go as he saw fit". Such testimony was clearly admissible as a circumstance supporting respondent's testimony as to the extent of his activities in procuring and selling the merchandise involved in the joint venture of himself and his father which later became the basis of the account stated. It is also urged that the court erred in permitting respondent's wife to testify as to respondent's activities outside of his employment at the Missouri Pacific Railroad and "that he had plenty of callers", on the ground such testimony constituted a conclusion and was not based upon the witness' personal knowledge. The record shows when the witness was asked if respondent carried on any activity outside of his employment at the Missouri Pacific, she replied, "Yes, sir. Plenty of callers came to the house." An objection was made. The court directed the witness to "describe those activities". The witness then testified without objection that she saw respondent deliver radios and other merchandise four or five times a week and on Saturdays and Sundays from 1945 until he "had a light stroke" in 1949. Such testimony was competent evidence. Appellant did not ask any further action on the part of the court as to the volunteered statement. The assignment is overruled.

The judgment is affirmed.

All concur.