Luther G. BLAIR and Marie Blair, husband and wife, Plaintiffs-Appellants,

v.

R. K. HAMILTON, John Morris, Roy Temple and Kenneth Dillon, Defendants-Respondents.

No. 7580.

Springfield Court of Appeals.

Missouri.

Dec. 20, 1956.

White & White, Roy V. Selleck, Rolla, for appellants.

Walker, Daniel, Clampett & Rittershouse, Springfield, for respondent, John Morris.

Breuer & Northern, Rolla, for respondents, R. K. Hamilton and Roy Temple.

C. W. Terry, Camdenton, for respondent, Kenneth Dillon.

McDOWELL, Presiding Judge.

This appeal is from a judgment rendered in the Circuit Court of Camden County, May 15, 1954, sustaining defendants' after-trial motion to set aside the jury's verdict in favor of plaintiffs in accordance with their motion for directed verdict at the close of plaintiffs' evidence and at the close of all the evidence, or, in the alternative, sustaining defendants' motion for new trial.

The action is in unlawful detainer, filed in the Magistrate's court of Pulaski County, Missouri, appealed to the Circuit Court and, on change of venue, transferred to the Circuit Court of Camden County where it was tried by jury. The theory on which the case was tried on plaintiffs' amended petition was that the lease had been forfeited under the terms of Section 441.020 RSMo 1949, V.A.M.S. and that forfeiture had been declared and possession demanded, because the defendants had suffered a gambling device to be "set up or kept or used in a house or building" on the leased premises. Plaintiffs sought to recover an increased rental for the period of the alleged detention, with

damages of $3,750 for waste because of alterations made and alleged injury to a building on the premises.

The jury returned a verdict on April 23, 1954, awarding plaintiffs' restitution of the premises, rentals of $300 per month for the period of detention, beginning with February, 1953, and until the premises were restored to plaintiffs, and no damages for "waste and injury to the premises".

The court entered judgment on this verdict April 23, 1954, with the rentals awarded being doubled, namely, to $600 per month, by virtue of the statute, section 534.330 RSMo 1949, V.A.M.S.

Plaintiffs filed no after-trial motion. Three defendants filed a motion for judgment (all four having moved for a directed verdict at the close of the evidence) and, in the alternative, for a new trial. The other defendant filed a motion for new trial, but by order of the court, was permitted to join in the motion of the other three defendants. On May 15, 1954, the court sustained the joint motion for judgment, set aside the previous judgment, and entered judgment for all defendants on the ground that the plaintiffs had failed to prove the allegations on which the claimed forfeiture was based, and, therefore, that the court had erred in failing to sustain defendants' motion for directed verdict. This judgment permitted the plaintiffs to collect the original rental under the lease, which had, in the meantime, been refused by plaintiffs. In the alternative, the court sustained defendants' motion for a new trial for the erroneous admission of evidence. From this judgment plaintiffs appealed.

The issues in the case, as submitted to the jury, were somewhat narrowed from the issues as made by the pleadings. They were, did the defendants after the 9th day of December, 1952, suffer any prohibited gaming device to be kept or used in a house or building located upon and forming a part of, the leased premises, for gaming purposes, to wit: a pair of dice, and used for gaming purposes, and, did the plaintiffs,

after they knew that defendants so suffered and permitted a gambling device to be operated upon the premises waive their right to declare a forfeiture by the acceptance of rent?

The principal question before this court is the sufficiency of the evidence to support the judgment.

We will briefly state the evidence covering the issues presented to this court. Plaintiffs, owners of the real estate and buildings involved, described as 100 feet by 210 feet, located on U. S. Highway 66 in Pulaski County, Missouri, near where said highway intersects the highway leading to Fort Leonard Wood, and known as the "Wagon Wheel", on August 9, 1950, leased the same to R. K. Hamilton for a term of one year at a monthly rental of $300 with annual renewal privileges for a period of ten years. The buildings on this property consisted of a filling station and restaurant. In the fall of 1950, Hamilton sub-let said property to John Morris of Springfield, who converted the restaurant building into a dry cleaning plant; by verbal agreement Morris sub-let the premises to defendant, Dillon, who operated the business on a percentage basis; Dillon took defendant, Roy Temple, in as a partner.

December 23, 1952, plaintiffs forfeited the lease and demanded possession of the premises.

Dorsey Rayl, sheriff of Pulaski County, Glenn Brandon and Luther Owsley, deputy sheriffs, Elmer Thixton, an employee of the Telephone Company and Richard Knight, State Patrolman, were called as witnesses by the plaintiffs. The sheriffs and patrolman testified they were called by the plaintiffs to the "Wagon Wheel" to investigate gambling; that they observed a number of men on the leased premises, some standing, some kneeling and some sitting, but testified they did not observe any gambling there. The patrolman testified that he was called five or six times to investigate gambling but, at no time, saw any one gambling. Thixton testified that he worked for the

Telephone Company and prepared the directories for 1951 and 1952 and identified an advertisement contained therein which showed that Dillon and Temple were engaged in the wrecker business.

Plaintiffs' evidence as to any gambling being carried on on the premises was limited solely to that of plaintiffs and their son, Jan, age 12 years.

Plaintiff, Luther Blair, testified:

"Q. Now then, Mr. Blair, did you know anything about gambling going on there in December, 1952? A. Yes.

"Q. During the month of December, 1952? A. Yes.

"Q. Well, just during the month, particularly after the 9th of the month of December, 1952. If you observed any before that time you might mention that date; otherwise, just tell what you saw. A. Yes. In that month, yes, there was, and prior to · that. Now * * *"

He stated that some dice games went on there in that month and then testified:

"A. I don't recall whether I saw that in the grease room during that month. I saw them assembled in the grease room, but I couldn't say that they were.

"Q. Well, specifically, where was this gambling going on that you testified that you saw during that month? A. Well, it was there on the slab, and I have saw it in the grease room, but I don't have any recollection of seeing it that month inside the grease room.

"Q. And you say you observed several instances of gambling there during that one month? A. Yes. Twice I saw them—No, not during that one month; * * * Yes, there was hardly a month passed. * * *"

The witness testified that he actually saw the dice and saw money exchange hands and that he knew it was a dice game. He stated there was one game at night; that about 2:00 o'clock in the morning "we were waked up, * * * and there was a game going out there," but he wouldn't say at what time that incident occurred. He did state that his wife knew and he was permitted to get the papers she kept of the records and this testimony was given:

"Q. Well, let's go back and talk about gambling, now, in November. Do you have any dates there in November and December, '52? A. In '52, I don't believe I do have."

He testified he talked to Kenneth Dillon about gambling on the premises two or three times. He thought the first time was in September, 1951, but could not recall the dates of the other times. He stated Dillon said he couldn't stop it and that the gambling continued. He testified he talked to Temple, the first time in July, 1951. He stated that while he was eating dinner, possibly 1 o'clock, his attention was called to a dice game outside his kitchen door; that a shower of rain came and the game broke up; that he went over to the station and inquired who was in charge and Temple stated that he was and asked what was wrong; that he told Temple a dice game had been going on on the premises for two days and Temple said he didn't know about it. He said that as he went over to the filling station, there was a game going on in the grease room, and he asked Temple if he wanted to see it; that Temple shook his head and walked back in the door, just quit talking. He stated Temple said that it was none of his business what went on so long as he took no part in it.

The witness testified he had a conversation with defendant Hamilton in the courthouse in Waynesville. He did not remember the date but believed it was in 1952. He was permitted to examine his record but stated that his wife did not have the record there, but he thought it was in the fall. He stated that Hamilton came to him and said: "That thing is going to

be different out there, that is going to stop." He said they were talking about gambling.

The witness stated he talked to Morris between two and three years ago; that Morris came up and shook hands with him and his wife and said: "Mr. Blair let's get this settled", he said "we can settle this without these Lawyers", and that was about the extent of the conversation.

The witness admitted that after he had knowledge of the gambling being carried on upon the premises and before he declared a forfeiture for such law violations, he had accepted checks for rent for some 16 or 18 months. He gave this testimony:

"Q. So, notwithstanding your knowledge that gambling was going on there on the premises by these truck drivers, or someone else, you did continue to receive a rent check every month for a period of eighteen months thereafter, did you not, or through 1952? A. Yes.

"Q. Now, you didn't undertake to declare a forfeiture until something like eighteen months after you saw that gambling, did you? You saw the gambling there on July 5th or 6th, 1951, and you did not undertake to declare a forfeiture until December, 1952, or some sixteen or seventeen or eighteen months afterwards? A. That's right. It just kept continuing on there.

"Q. You were paid the rent and accepted it up until the last of December, 1952, didn't you? A. Yes.

"Q. And since that time he has sent you a check every month, up until April 9th, 1954, and those checks for the year of 1954 you have refused to cash? A. Yes."

Jan Blair testified that he and his brother went to the filling station to buy some pop and observed some men on their hands and knees playing a game with some little square things which his Mother and Dad called dice; that they returned home and he told his mother. He said he saw money in one man's hands. He stated he did not remember the date.

Plaintiff, Marie Blair, testified that the first time she saw gambling on the premises was July 5, 1951; that it was on the concrete slab about 15 feet from their back door; that she was at the time informed by her son, Jan, and his brother that the game was going on. She stated that some men were shooting craps and continued up until about 8:00 or 8:30 at night; that they came back the next day and shot craps until about 1:30 when her husband came in; that it began to rain and the men went into the grease room. She testified she called the sheriff the day before but he did not come until July 6, 1951, after Mr. Blair had gone down to get him. She stated that on July 6, 1951, the men were in the grease room shooting dice. She testified:

"Q. You may go ahead. A. They shot dice off and on then until after we brought that suit against Mr. Temple for permitting it, and it let up for a little while, and then they started again, and it was worse in 1952, along in November and December, it was worse for a while there, until we went back to Court on the other trial for Mr. Temple. On September 24, 1951, Mr. Dillon was there, and I called him and showed him the dice game that was going on, and he told the boys, he said 'Here, here, no more of that,' they did break up for a short time, and that evening later they shot craps, and the next morning they were at it again. We have had that off and on. And on June 17th, in 1953, was the last time that I have saw a dice game there. There was a negro with one of the station attendants shooting dice and throwing bottles at the house there. * * *"

She testified about a conference with Dillon concerning gaming activities in 1951, and he said he could not stop gambling; that she had a conference with Hamilton on December 3, 1951, at the courtroom in Waynesville and Hamilton said, "It is terrible what is going on out there, I will be to see you and Mr. Blair, and we will get this straightened out", but he never came.

In our opinion we will refer to appellants as plaintiffs and to respondents as defendants, the position they occupied in the lower court.

The first allegation of error complains of the judgment of the trial court finding that plaintiffs' evidence totally failed to make a case.

■ In a jury tried case we do not weigh the evidence. It is only when there is a complete absence of probative facts in such cases to support the verdict that appellate courts are authorized to interfere. Siegel v. Ellis, Mo.Sup., 288 S.W.2d 932, 934(1).

■ Consequently, we must state and review the evidence from the viewpoint most favorable to plaintiffs, Machens v. Machens, Mo.Sup., 263 S.W.2d 727, 734 (16), and disregard defendant's evidence except to the extent it aids plaintiff's case, 3 Mo.Dig.Pt. 1, Appeal and Error 927(7).

Plaintiffs base the right of forfeiture upon a violation of section 441.020 RSMo 1949, V.A.M.S. which provides:

"Whenever any lessee of any house or building shall suffer any prohibited gaming table, bank or device to be set up or be kept or used therein, for the purpose of gaming, or keeping in the same a bawdy house, brothel or common gaming house, the lease or agreement for letting such house or building shall become void, and the lessor may enter on the premises so let, and shall have the same remedies for the recovery thereof, as in the case of a tenant holding over his term."

In the instant case we are concerned only with the question of whether or not the defendants suffered any prohibited gaming device to wit, shooting dice, to be kept or set up in a house or building on the leased premises after December 9, 1952, as plaintiffs, at the close of their case, requested the trial court to withdraw from the jury the issue of keeping a bawdy house.

Under plaintiffs' instruction I, the jury was authorized to return a verdict for plaintiffs, provided a finding was made that the defendants did, after the 9th day of December, 1952, suffer any prohibited gaming device to be set up or kept or used in a house or building located upon, and forming a part of said leased premises, for gaming purposes, to wit, a pair of dice, and used for gaming purposes and commonly known as craps.

■ Plaintiffs are bound by the theory on which they submit their case to the jury. Dugan v. Trout, Mo.App., 271 S.W.2d 593, 598; State ex inf. Mooney ex rel. Stewart v. Consolidated School Dist. No. 3, Mo. App., 281 S.W.2d 511, 515.

■ Our law requires that an instruction submitting plaintiff's case to the jury and predicating his recovery must include all the essential elements to plaintiff's case. Banta v. Union Pacific R. Co., 362 Mo. 421, 242 S.W.2d 34, 42.

■ Under the evidence in the case at bar the trial court was right in finding that plaintiffs wholly failed to offer any evidence that gambling took place, or was permitted to take place, in any building or buildings on the premises leased after December 9, 1952. No witness testified to any such acts and, under plaintiffs' instruction to the jury numbered I submitting plaintiffs' theory of the case, there was no evidence upon which to base it.

Under this assignment plaintiffs stated that the trial court failed to consider evidence that gamblers were assembled in the grease room after December 9, 1952, as

found in the record at pages 153–4. An examination of the record discloses that plaintiff, Luther Blair, definitely testified that he did not see any gambling on the premises within the building or grease room during the month of December, 1952.

Plaintiffs cite, as authority for their contention here, Hurck v. Mo. Pac. Ry. Co., 252 Mo. 39, 48, 158 S.W. 581; Ryan v. Burrow, 326 Mo. 896, 900, 33 S.W.2d 928, 929, and Radabaugh v. Williford, 342 Mo. 528, 534, 116 S.W.2d 118, 120. The law declared in these cases is, that it is the duty of the jury to determine the facts in law cases tried by a jury. That has long been the law in Missouri. In Willey v. Fyrogas Co., 363 Mo. 406, 251 S.W.2d 635, 642, this law was stated:

"* * * It goes without saying that a jury's verdict may not be based upon mere speculation or conjecture, but neither may the jury be deprived of its power and function of reasoning upon the evidence and drawing inferences, Van Brock v. First Nat. Bank in St. Louis, 349 Mo. 425, 431, 161 `S.W.2d 258, 261, and, if there is substantial, probative evidence to support either the plaintiff's cause of action or the defenses the weight and credibility of the evidence, and ultimately its meaning, are necessarily for the jury's consideration and determination. Cluck v. Abe, 328 Mo. 81, 40 S.W.2d 558. The decisive and essentially meritorious question upon this appeal is whether there is substantial, probative evidence from which Ruud's and Robertshaw-Fulton's negligence could be found under the modern general rule. * * *"

The question in the instant case upon this appeal is whether there is substantial, probative evidence to prove that the defendants violated section 441.020 RSMo 1949, V.A.M.S., in that they did after the 9th day of December, 1952, suffer any prohibited gaming device to be set up, or kept or used in any house or building located upon and forming a part of the said leased premises for gaming purposes, to wit, a pair of dice, commonly known as craps.

We find there was no substantial evidence to support the verdict of the jury in finding for the plaintiffs. To infer from acts of gambling shown to have taken place at other dates mostly on the outside of the buildings would be basing a verdict upon mere speculation and conjecture.

Judgment affirmed.

STONE and RUARK, JJ., concur.