Cite as 2025 Ark. App. 604

# ARKANSAS COURT OF APPEALS
## DIVISION IV
No. CV-24-642

| | |
|---|---|
| THE LAURA TAYLOR LIVING TRUST, LAURA TAYLOR AND FRANK TAYLOR, TRUSTEES<br><br>APPELLANT<br><br>V.<br><br>THE DAVID L. LITTRELL REV. TRUST DATED MAY 18, 2000, DAVID L. LITTRELL AND MARY R. LITTRELL, TRUSTEES; AND THE MARY R. LITTRELL REV. TRUST DATED MAY 18, 2000, DAVID L. LITTRELL AND MARY R. LIITRELL, TRUSTEES<br><br>APPELLEES | Opinion Delivered December 10, 2025<br><br>APPEAL FROM THE MADISON COUNTY CIRCUIT COURT<br>[NO. 44CV-23-82]<br><br>HONORABLE BETH STOREY BRYAN, JUDGE<br><br>AFFIRMED |

**CINDY GRACE THYER, Judge**

This appeal arises from an order of the Madison County Circuit Court denying and dismissing the petition for a prescriptive easement sought by appellant, the Laura Taylor Living Trust, Laura Taylor and Frank Taylor, trustees (hereinafter "the Taylors"). On appeal, the Taylors argue that the circuit court erred in finding their use of the land at issue did not ripen into a prescriptive easement; they also challenge several specific factual findings made by the circuit court. We find no error and affirm.

## I. *Factual and Procedural Background*

The dispute in this case centers on access to a dirt road running across land owned by the David L. Littrell Revocable Trust ("the Littrells"), which the Taylors have used in the past to access their property. The Taylors own approximately three hundred acres of land in Madison County. Their property is roughly bisected by the Kings River. The Littrells own another three hundred acres to the north of the Taylors' property. Madison County Road 2425 ("Madison 2425") runs south from Highway 412, continues through the Littrells' property, and ends at the Littrells' house. Where Madison 2425 ends, the dirt road that is at issue in this case continues to run through the Littrells' yard, to a gate, across a field, and to another gate at the boundary with the Taylors' property.

After the Taylors bought their property in August 2010, they used Madison 2425 to access their land. In April 2023, however, the Littrells locked the gate at their edge of their property, thus preventing the Taylors from accessing their property by that route. In July 2023, the Taylors filed a complaint for a declaratory judgment and a prescriptive easement asking the circuit court to either determine that Madison 2425 provided a legal right of access to their property or to find that they were entitled to a prescriptive easement over the road.

The Littrells answered, acknowledging that the road from the end of Madison 2425 across the Taylors' property had been used with their (the Littrells') permission for a number of years. The Littrells also noted that they had continued to allow use of the road after the Taylors had purchased the property until a dispute arose between them. The Littrells further

pointed out that the Taylors had access to their property via Madison County Road 2405 ("Madison 2405") and used that road to access the RV park located on their land. The Littrells asserted that they had offered to convey to the Taylors a personal easement for agricultural purposes, but the Taylors rejected the offer. The Littrells therefore asked the court to dismiss the Taylors' complaint for declaratory judgment and prescriptive easement.

The case proceeded to trial in June 2024. As part of their case-in-chief, the Taylors called numerous witnesses to testify about the history and use of the property. Crystal Ogden, the Madison County assessor, testified that the Taylors' parcel of land had a physical address on Madison 2425. She noted that the property was given the address in 2016, but before that time there had been no address on it at all. She also acknowledged that the Taylors' RV park on the west side of the Kings River had a physical address on Madison 2405.

Janet Havens, *née* Hargis, is the daughter of Edith and Thomas Hargis, who originally owned the land that the Taylors now own. She explained that the property consisted of two tracts of land that the family called the Upper Place and the Lower Place. She said that her parents lived on the Upper Place but moved before she was born; however, they continued to use the Upper Place for raising cattle and growing hay. Her parents drove the cattle from the Upper Place to the Lower Place via the dirt road that ran between the properties and past the Littrells' place. She said that access to the Upper Place, which predated 1960, was via the dirt road that ran in front of and past the Littrells' home; that dirt road was more commonly known as Madison 2425. When her father passed away in 1977, Janet's brother,

Donald, inherited the Upper Place, and she inherited the Lower Place. Later, after Donald developed cancer, he sold the Upper Place to the Taylors.

On cross-examination, Janet testified that she and her brother both rented the farm property to Joe Carter, who lived east of both their property and the Littrells' property. She said that she did not go to the Upper Place very often, having moved away in 1962, but she recalled that Joe rented the land for a long time beginning in the 1970s. She added that she did not know much about the use of the road in dispute after her parents had passed away, but she said that Donald and his family would come to visit once a year or so and would use the road to get to the Upper Place. Janet acknowledged that one could access the Upper Place from Madison 2405 by crossing the river, adding that when her parents owned it, there was also a road along the river that they used to get from the Upper Place to the Lower Place.

David Hargis, Donald's son and Janet's nephew, testified that his father inherited the farm when his father (David's grandfather) passed away. He recalled visiting the property when he was ten or twelve years old, when his father was stationed at the Air Force base in Illinois. He said that they would drive down during farming season to bale hay. He did not remember the county road number that they used to drive to the Upper Place, but he did remember that there was only one road they used to get to the property. When he was fourteen years old, he and his family came back to Arkansas for his grandfather's funeral and to round up the cattle on the Upper Place. At that time, they drove the cattle across pastureland and did not drive them along the road. On another occasion, when his daughters were five and six years old, he drove them past the family's original homesite at

4

the Upper Place and let them play in the river. His father still owned the property at the time. He did not recall ever asking permission to use the road but remembered meeting Clint Littrell when he was around twelve years old as they were driving past his house. The last time he tried to visit the Upper Place was when his father died. He said that they tried to spread his ashes on the Upper Place, but the land had been sold and there was a small chain on the gate at the end of the road by the Littrells' house, so they spread the ashes on the Lower Place instead. David identified Madison 2425 on a map as running between the Littrell property and some woods and down to the Upper Place. He added that he had gone to the Upper Place shortly before trial with the Taylors, accessing it from across the river by their RV park.

Frank Taylor testified that he lived in Springdale but owned what the Hargises called the Upper Place. He said that he viewed his property as being separated into two parcels: 140 acres on the west side of the Kings River and 160 acres on the east side of the river. He explained that he had no issues with the acres to the west of the river, where his RV park was located, but wanted to continue to use Madison 2425 to access the east side.

Frank stated that he bought the property in January 2010. When he looked at the property before buying it, he drove east out of Marble and turned right on Madison 2425, which passed in front of the Littrells' home and then down to his gate. He said that the realtor told him that Madison 2425 was "your access to this side of the property" and added that "that was the way we got in there, that was the way it's been for fourteen years since I bought it." Frank testified that the seller's disclosure, which came with the purchase of the

land, indicated that Madison 2425 was the route to access the Upper Place. He added that he would not have bought the property if it had not had any access to it.

Regarding his use of the road, Frank said he had been using the road since he bought the property in 2010. When asked what authority he had to use the road, he said "it's always been that way. It was on our contract, and we've always used it. It was the way that we were told from our realtor, that that was the access to that 160 acres there and we've been using it forever." He said that he had never asked permission to use it, but he had a good relationship with his neighbors. He and his wife used the area for recreation and had allowed a horse club to use it; other people had used the road to bring in their horse trailers, and friends had brought equipment onto the property using the road.

At one point, Frank leased the Upper Place to Joe Carter, who owned some adjacent land to the east. He then leased it to relatives of the Hargises and most recently had leased it to Shannon Fancher. When he and his wife put a small house on the property about a year before the trial, they utilized a transport building mover, who used Madison 2425 to bring it onto their land. He said that he had used the road "hundreds, if not thousands" of times and had never tried to sneak in or hide the fact that he was using it.

On cross-examination, Frank acknowledged that he used Madison 2405 to get to his RV park, which was on the west side of the river. He also agreed that there were other "primitive" roads on his property that allowed access at other points, conceding that when Joe Carter leased the property from the Taylors, he had other ways of getting there besides using Madison 2425.

6

Frank agreed that the problems between the Taylors and the Littrells began when it appeared to the Littrells that the Taylors might be planning to put another trailer park on the property. Although Frank denied that he had any plans to do so, he conceded that the gate had been locked after they moved a "tiny home," which looked similar to the office of their RV park, onto the east side of the property. He said that he had not used Madison 2425 to access his property since the gate went up, and he also acknowledged that he had been crossing the river every time he wanted to get to the east side of the property.

Frank said that the Littrells' attorney sent his attorney a letter in May 2023 regarding the Taylors' allegations that they had been locked out of their property. In that letter, counsel advised that David Littrell had said that the gate was not locked and that the person who cuts the Taylors' hay had already been told he could use the road as needed. The letter also offered to grant the Taylors a personal easement for ingress and egress along the existing road for normal farm and family purposes but not for commercial use.

The Taylors' next witness was Mary Littrell. She said that she had lived in Springdale since 1966 and had visited the Madison County farm property maybe twice a month since 2010. Her husband had lived on the farm until he passed away in 2023, and while no one was currently living there, she and other family members were fixing it up to use "when they want to go out in the country where it's quiet and enjoy the peace and quiet." Mary said that she had never had a conversation with Laura or Frank Taylor before the lawsuit, although she was aware that they owned the property south of hers. Mary recalled that her husband had told her that he had given the people who bought that property permission to use the

7

road that went down to their place, although she admitted she never saw him speaking to them. On cross-examination, however, she noted that she had never actually seen the Taylors go through her yard via the road.

Laura Taylor testified that she and Frank had freely used the road on the east side of the river from the time they bought their property until they moved the little house onto the land in 2023, at which time the Littrells locked the gate. She said she had never asked permission to use the gate, even before it was locked, because her understanding was that the road was County Road 2425 and that it gave them free access to their property. She still believed the road that crossed the Littrells' property was a county road that was no longer maintained. Laura said that she had spoken to David Littrell once about improving a portion of the road, but the county actually came out and did the work. The improvement, however, was not on the contested part of the road but was further up the road. She said that neither David Littrell nor anyone else had ever given her permission to use the road past where it left the Littrells' yard.

On cross-examination, Laura said that she and Frank used Madison 2405 to reach their RV park. She was shown an aerial photograph of the park and acknowledged that there was a well-used path from the road to the park and from the park to the river. She said she didn't like to cross the river there, though, because "you can't get across the river very often" and it was "not a good path to take."

After the Taylors rested their case, the Littrells first called Shannon Fancher to testify. Fancher's property is on the west side of the Littrells' land and is about a mile from the

Taylors. To reach his land, he exits Highway 412 onto Madison 2405 and drives about a mile. He had had a lease to cut hay on the Taylors' property for about six or seven years, and he used Madison 2405 to get from his property to theirs. He noted that the hay field was on the east side of the river, and there was "really great access" across the river right by the Taylors' RV park because it was "so shallow there." He said he would take his tractors and hay equipment that way, and the only time he had ever not been able to access it from that direction was when there had been an extreme rain event.

Regarding the Littrells' property, Fancher said he had been helping with the cattle and baling hay there for about six years. He said that if he was going to the Littrell place, he would take Madison 2425 to get there. That road ended at the Littrells' house, and past that, there was a gate that went down to the Taylors' property. Ordinarily, when he was working on the Taylors' property, he would come across the river by the RV park, but if he was hauling poultry litter, he would call David Littrell and ask his permission to use Madison 2425 in order to avoid taking the litter across the river.

Fancher also added that he helped Joe Carter and his son haul hay. When they would cut hay on the Taylor property, they would access it from Carter's house instead of using Madison 2425. When asked how many times he had seen the Taylors use the 2425 access, he said it was "very few" to occasional but not on a regular basis. Fancher said he had never had to unlock a gate to get through on the Littrells' property.

David Allen Littrell, David and Mary's son, was the final witness. He said that his family had owned the land for at least four generations. He and his father started running

9

cattle on the land around 1978, and he was at the farm usually two or three days a week. Since the Taylors had purchased the land in 2010, he had seen them using Madison 2425 "once or twice." He said he did not really have a problem with the Taylors using the road like they had in the past as a way to get to their property, but everything came to a head when his family thought they were going to be putting in another RV park. On cross-examination, David acknowledged that from photos, the road looked like a road that had been used more than once or twice in fourteen years. He noted, however, that his family used the road as well.

At the conclusion of the trial, the Taylors withdrew their request for a declaratory judgment that the road was a county road, leaving only the question of the prescriptive easement. The court then invited both parties to submit proposed findings of fact in lieu of closing arguments. Both parties did so.

The circuit court subsequently entered an order on June 13, 2024, denying the Taylors' request for a prescriptive easement. In its order, after reciting the facts presented at trial, the court found that until March 2023, when the Taylors placed the small house on their property using the disputed road, "their use had been merely for visiting the property, which per Mary Littrell's testimony, they had permission to do so." The court also noted that Shannon Fancher had permission to use the road for farming purposes, and he asked for and received permission to use it each time he crossed it. The court thus found that for thirteen of the fourteen years that the Taylors owned their property, there was no behavior that would have put the Littrells on notice that the use of the disputed road was under a

claim of right. Essentially, the court found that the credible testimony and evidence showed that the Taylors' use of the disputed road had been permissive, and they therefore failed to prove their claim to a prescriptive easement.

## II. *Standard of Review*

Equity cases, such as those involving prescriptive easements, are reviewed de novo on the record. *Cross Cnty. Sch. Dist. v. Turbiville*, 2020 Ark. App. 478, 612 S.W.3d 723. A circuit court's finding with respect to the existence of a prescriptive easement will not be reversed by this court unless it is clearly erroneous. *Johnson v. Jones*, 64 Ark. App. 20, 977 S.W.2d 903 (1998). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Branscum v. Nelson*, 2022 Ark. App. 354, 654 S.W.3d 343. In reviewing a circuit court's findings, we give due deference to that court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *Id.* Disputed facts and determinations of witness credibility are within the province of the fact-finder. *Id.*

## III. *Discussion*

### A. Prescriptive Easement

In their first point on appeal, the Taylors argue that the circuit court erred in finding that they failed to establish their entitlement to a prescriptive easement. A prescriptive easement may be gained by one not in fee possession of the land by operation of law in a manner similar to adverse possession. *Neyland v. Hunter*, 282 Ark. 323, 668 S.W.2d 530

(1984). Like adverse possession, "prescriptive easements . . . are not favored in the law, since they necessarily work corresponding losses or forfeitures in the rights of other persons." *Owners Ass'n of Foxcroft Woods, Inc. v. Foxglen Assocs.*, 346 Ark. 354, 363-64, 57 S.W.3d 187, 193-94 (2001). As the plaintiffs, the Taylors bore the burden of showing by a preponderance of the evidence that their use of the land in question was adverse, not permissive. *Owners Ass'n of Foxcroft Woods, supra*. The determination of whether a use is adverse or permissive is a factual question, and former decisions are rarely controlling on this factual issue. *Id.*

There is a presumption of permissive use for unenclosed and unimproved land. Therefore, one seeking a prescriptive easement over open, undeveloped land must rebut the presumption of permissive use and demonstrate, by a preponderance of the evidence, that one's use has been adverse to the true owner and under a claim of right for the statutory period of seven years. *Fullenwider v. Kitchens*, 223 Ark. 442, 443-44, 266 S.W.2d 281, 282 (1954); *see also Manitowoc Remanufacturing, Inc. v. Vocque*, 307 Ark. 271, 819 S.W.2d 275 (1991). *Fullenwider* explained the rationale for this presumption of permissive use as follows:

> The reason for the rule that a passageway over unenclosed and unimproved land is deemed to be permissive is sound and also easily understandable . . . . It assumes that the owner of such land in many instances will not be in position to readily detect or prevent others from crossing over his land, and, even if he did, he might not enter any objection because of a desire to accommodate others and because such usage resulted in no immediate damage to him. Also in such instances the landowner would probably have no reason to think the users of the passageway were attempting to acquire any adverse rights. On the other hand there would be no reason or basis for such inference of permission on the part of the landowner if someone tore down his fence or destroyed his crops by reason of such usage. These acts alone would be calculated to put the landowner on notice that others were using his land adversely to his own interest and right of occupation.

*Fullenwider*, 223 Ark. at 445, 266 S.W.3d at 283.

In their brief, the Taylors rely on what they call the "passageway exception" to the general presumption of permissive use. That "exception" was explained in *Fields v. Ginger* as follows:

> Where there is usage of a passageway over land, whether it began by permission or otherwise, if that usage continues openly for seven years *after the landowner has actual knowledge that the usage is adverse to his interest* or where the usage continues for seven years *after the facts and circumstances of the prior usage are such that the landowner would be presumed to know the usage was adverse*, then such usage ripens into an absolute right.

54 Ark. App. 216, 221, 925 S.W.2d 794, 797 (1996) (emphasis added) (quoting *Fullenwider*, 223 Ark. at 446, 266 S.W.3d at 283).

In *Fields*, *supra*, the driveway at issue was the only means of access to the adverse possessors' home; both the adverse possessors and their predecessors in interest believed the driveway was theirs, based in large part on the representation of the original seller of the tract that the driveway belonged to them; and the adverse possessors' use of the drive was under a claim of right. *See also McGill v. Miller*, 172 Ark. 390, 288 S.W.2d 932 (1926) (stressing the importance of the fact that the adversely possessed road was the only convenient access to the adverse possessor's property).

In *Zunamon v. Jones*, 271 Ark. 789, 610 S.W.2d 286 (Ark. App. 1981), this court rejected the notion that it was necessary in all cases that persons claiming a prescriptive easement must openly communicate their intention to use the road adversely before a permissive use can ripen into an adverse right. Relying on *Fullenwider*, *supra*, and *McGill*, *supra*, *Zunamon* recognized that the length of time and the circumstances under which the

13

roadway was opened and used is sufficient to establish an adverse claim *when those circumstances indicate that the true owner knew or should have known that the road was being used adversely*. That is, there must be some circumstance in addition to length of use to show that the use was adverse. *Baysinger v. Biggers*, 100 Ark. App. 109, 265 S.W.3d 144 (2007). In *Baysinger*, this court noted that there was no circumstance, such as use by the general public, that would establish that the landowner knew or should have known that the use was hostile. Rather, the only evidence at trial was that the plaintiff had begun using the road to access his property in 1961 and that there had been no objection. Because there was no evidence, other than length of use, to establish that the landowner knew or should have known that the use was hostile, this court reversed the circuit court's finding of a prescriptive easement.

We therefore now consider whether the facts and circumstances in this case were sufficient to put the Littrells on notice that the Taylors' use of the road was adverse. Here, the evidence admittedly showed that the Taylors had openly used the roadway for more than seven years, although the evidence of the frequency of their use was disputed. As noted above, however, time alone will not suffice to transform permissive use into legal title. *Clark v. Eubanks*, 2019 Ark. App. 49, at 4, 570 S.W.3d 506, 509. Our de novo review of the evidence indicates that the Taylors used the road, which was not the only road giving the Taylors access to their property, with the Littrells' permission. Joe Carter and Shannon Fancher also used the road with the Littrells' permission. And while Frank Taylor testified that he had used the road hundreds, if not thousands, of times, the Littrells and Fancher testified that they had seen the Taylors a mere handful of times over the fourteen years since

14

they bought the land. Moreover, the Littrells did not do anything to restrict the Taylors' use of the land--thus evincing a knowledge that their use was adverse, *see Clark*, *supra*--until 2023, only one year before the Taylors filed suit. As in *Baysinger*, *supra*, the evidence showed merely that the Taylors had used the road without objection from the Littrells. Although the Taylors argue that the Littrells knew or should have known that their use was adverse, we cannot agree that the evidence put forth by the Taylors, as the party with the burden of proof, overcame the presumption of permissive use.

The circuit court was in the best position to assess the credibility of the witnesses and the weight to be accorded to their testimony. *See Bobo v. Askew*, 2025 Ark. App. 62, at 4, 718 S.W.3d 377, 381 ("Disputed facts and determinations of witness credibility are within the province of the fact-finder."). The court here specifically found that "the credible testimony and evidence does not support the [Taylors'] claim for a prescriptive easement as the Court finds that the [Taylors'] use, and their predecessors, has been permissive [and thus the Taylors have] failed to prove their claim[.]" Because a determination of whether the use of a roadway is adverse or permissive is a question of fact, we decline to put ourselves in the place of the circuit court to weigh that evidence. *Yarbery v. Edwards*, 2024 Ark. App. 263, at 7, 689 S.W.3d 73, 77; *Camp Nine Co. v. Firehunt, Inc.*, 2023 Ark. App. 421, at 9, 676 S.W.3d 284, 290–91. We therefore affirm the circuit court's determination that the Taylors failed to prove that their use of the road ripened into a prescriptive easement.

B. Specific Factual Findings

15

In their second point on appeal, the Taylors assert that the circuit court clearly erred with respect to three specific factual findings. This court reviews matters that traditionally sounded in equity de novo on the record but will not reverse a finding of fact by the lower court unless it is clearly erroneous. *Ridgewood Timber Corp. v. Haddock*, 2025 Ark. App. 493, ___ S.W.3d ___. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Owners Ass'n of Foxcroft Woods*, *supra*.

In their brief, the Taylors point to three specific findings in the circuit court's order and claim that those findings are factually incorrect. First, they cite the court's finding that Joe Carter was the only user of the disputed passageway from 1977 to 2012. Second, they assert that the evidence contradicts the court's finding that Hugh Hargis never used the property that utilized the disputed easement. And third, they argue that the evidence clearly contradicted the circuit court's finding that there was no evidence of the use of the disputed easement from 1977 to 2012.

The Taylors recite testimony, compare it to the court's findings, and point out what they perceive to be discrepancies and errors. Even assuming (without agreeing) that the court's factual findings on these specific points are erroneous, however, the Taylors make no argument that those findings caused the court's overall conclusion about the existence of a prescriptive easement to be erroneous. The true crux of their argument can be found near the end of their brief wherein they state that "the trial court's repeated adoption of facts raised by the [Littrells] in their proposed findings of fact and conclusion of law despite there

being no evidence to support these facts *draws into question whether the trial court's weighing of the evidence and testimony should be given any due deference*." (Emphasis added.) It therefore appears that the true gist of the Taylors' argument is that they believe the circuit court erred by adopting the Littrells' proposed findings of fact and conclusions of law instead of theirs.

Notably, however, the Taylors offer no citation to authority that precludes a circuit court from choosing to adopt one party's proposed findings of facts and conclusions of law over another's. This court has held that when the circuit court invites posttrial briefs or proposed findings of fact, a circuit court does not err if it adopts the order of one party as its own. *Powhatan Cemetery, Inc. v. Colbert*, 104 Ark. App. 290, 298, 292 S.W.3d 302, 309 (2009). Nothing in Arkansas Rule of Civil Procedure 52(a) precludes a court from doing so.

Nor do the Taylors specifically argue how the circuit court's factual findings caused its ultimate conclusion––that they were not entitled to a prescriptive easement––to be clearly erroneous. They merely recite their interpretation of the facts and conclude that the court's findings were wrong; however, they offer neither argument nor citation to authority in support of their contention. It is axiomatic that this court will not consider arguments that are unsupported by convincing argument or sufficient citation to legal authority. *Denning v. Denning*, 2025 Ark. App. 499; *Thigpen v. City of El Dorado*, 2020 Ark. App. 531. It is also a well-settled principle of appellate law that we will not make a party's argument for him or her. *Mann v. Pierce*, 2016 Ark. 418, 505 S.W.3d 150; *Nelson v. Fullerton*, 2023 Ark. App. 311.

17

Because the Taylors have failed to make a persuasive, legally supported argument that the circuit court's alleged factual errors were material to the court's ultimate legal conclusion, we affirm on this point.

Affirmed.

ABRAMSON and MURPHY, JJ., agree.

*Thurman & Flanagin*, by: *Stevin Williams*, for appellant.

*William Alex Allred*, for appellees.